RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MARCIAL LOPEZ,

*Petitioner,*

*v.*

No. 16-3083

JEFF B. SESSIONS, Attorney General,

*Respondent.*

On Petition for Review from the
Board of Immigration Appeals.
No. A 071 899 431.

Argued: March 9, 2017

Decided and Filed: March 21, 2017

Before: CLAY, SUTTON, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Scott E. Bratton, MARGARET WONG & ASSOCIATES, CO., LPA, Cleveland, Ohio, for Petitioner. Colin J. Tucker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Margaret Wong, MARGARET WONG & ASSOCIATES, CO., LPA, Cleveland, Ohio, for Petitioner. Colin J. Tucker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

## OPINION

_____

SUTTON, Circuit Judge. Marcial Lopez, a native and citizen of Guatemala, contests a decision by the Board of Immigration Appeals that prohibits him from staying in this country. Under the immigration laws, it usually counts against the individual if he enters the country free

from governmental detection or restraint—if, that is, he sneaks across the border. *See, e.g.,* 8 U.S.C. § 1326(a). But under the "special rule cancellation" of removal provisions of the Nicaraguan Adjustment and Central American Relief Act, it favors the individual if he sneaks across the border without detection or restraint. In the words of the Act, he must show that he has "not been apprehended at the time of entry" since 1990.

The burden is on the applicant to make this showing. That's easy enough when it comes to presenting evidence that no government official has physically stopped him when he tried to cross the border during that period of time. But another form of official restraint at the border is continued surveillance as the individual enters the country. What then? Must the individual submit evidence that he does not have and should not have—that government agents were not tracking his movement as he made his way into the country? The applicant cannot be asked to prove what he cannot obtain. Instead, once the applicant has met his burden by showing that no one physically stopped him at the border during that period of time, the government is free to put on any surveillance evidence in the nature of an affirmative defense. That's not what the Board of Immigration Appeals did here. It simply held that Lopez had failed to meet his burden of proof and incorrectly rejected his petition on that ground alone. For these reasons and others elaborated below, we grant the petition for review in part and deny it in part.

I.

Returning from a visit to his ailing father in Guatemala, Lopez crossed the Rio Grande around 11:30 p.m. on May 24, 2001, just west of Brownsville, Texas. About thirty-one minutes later, the border patrol arrested Lopez roughly a mile from the border at or near Brownsville. Lopez lied to the border patrol about his name and nationality. Thinking that Lopez was a citizen of Mexico, the border patrol let him voluntarily return to Mexico. Lopez later crossed back into the United States, this time evading any apprehension and (apparently) any surveillance.

The Department of Homeland Security tried to deport Lopez in 2008. Lopez applied for special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act, *see* 8 U.S.C. § 1229b(e)(3), and cancellation of removal, *id.* § 1229b(b)(1).

Of relevance here, the Immigration Judge ruled that Lopez failed (1) "to prove that he has not been apprehended at the time of entry after December 19, 1990," and (2) "to establish that his removal from the United States would result in exceptional and extremely unusual hardship to his qualifying relatives," including Lopez's American daughter. A.R. 96–98.

The Board of Immigration Appeals agreed on both fronts. Lopez appealed. 8 U.S.C. § 1252(b).

II.

There are a few ground rules for reviewing such applications. On the one hand, we may not review "any judgment regarding the granting of relief under section . . . 1229b," which covers cancellation of removal, and "any other decision or action of the Attorney General . . . the authority for which is specified . . . to be in the discretion of the Attorney General." 8 U.S.C. § 1252(a)(2)(B). The Nicaraguan Adjustment and Central American Relief Act grants the Attorney General, acting through the Board and the Immigration Judges, discretion over special rule cancellation of removal determinations. Pub. L. No. 105-100, § 203(a)(1), 111 Stat. 2160, 2197–98 (1997); *see Ruiz v. Gonzales*, 455 F.3d 661, 662 (6th Cir. 2006) (per curiam). That means we "lack[] jurisdiction over claims that can be evaluated only by engaging in head-to-head comparisons between the facts of the petitioner's case and those of precedential decisions," or over arguments that "require[] a tallying of hardships" or "second-guessing the agency's weighing of factors." *Ettienne v. Holder*, 659 F.3d 513, 518 (6th Cir. 2011).

On the other hand, we retain jurisdiction to review "constitutional claims or questions of law raised upon a petition for review," 8 U.S.C. § 1252(a)(2)(D), and "non-discretionary decisions" dictated by agency precedent, *Aburto-Rocha v. Mukasey*, 535 F.3d 500, 503 (6th Cir. 2008). The burden is on Lopez to show by a preponderance of the evidence that he satisfies the eligibility requirements. 8 C.F.R. § 1240.64(a). Only after Lopez establishes his eligibility for cancellation of removal or special rule cancellation does the Attorney General have "discretion to grant or deny the application" as he deems appropriate. *Sad v. INS*, 246 F.3d 811, 819 (6th Cir. 2001).

To be eligible for special rule cancellation of removal and run-of-the-mine cancellation of removal, the applicant must show, respectively, that (1) he "was not apprehended after December 19, 1990, at the time of entry," Pub. L. No. 105-100, § 203(a)(1), 111 Stat. 2160, 2197–98 (1997); *see* 8 C.F.R. § 240.61(a)(1), and (2) that his removal from the United States "would result in exceptional and extremely unusual hardship" to his qualifying relatives, 8 U.S.C. § 1299b(b)(1)(D). In this instance, the Board ruled that Lopez was ineligible for special rule cancellation because he was not free from official restraint at the time of his 2001 crossing and that he was ineligible for ordinary cancellation because his removal would not cause undue hardship to his family. The former ruling is a question of law, the latter an application of it. *See De Leon v. Holder*, 761 F.3d 336, 341 (4th Cir. 2014).

*"Apprehended . . . at the time of entry."* The Nicaraguan Adjustment and Central American Relief Act grants the Attorney General authority over special rule cancellation of removal determinations. Pub. L. No. 105-100, § 203(a)(1), 111 Stat. 2160, 2197–98 (1997). Among other grants of power, the Attorney General, through decisions of the Board of Immigration Appeals, may cancel the removal of certain Guatemalans who have "not been apprehended at the time of entry after December 19, 1990." 8 C.F.R. § 240.61(a)(1). The question at hand is whether law enforcement stopped Lopez "at the time of entry" in May 2001.

The Board has long defined "entry" into our country for immigration purposes to require (1) a crossing into the territorial limits of the United States; (2) inspection and admission by an immigration officer or actual and intentional evasion of inspection; and (3) freedom from official restraint. *In re Pierre*, 14 I. & N. Dec. 467, 468 (BIA 1973); *see De Leon*, 761 F.3d at 338. No one challenges that definition here. The key insight for our purposes comes from the last requirement—that one small step on American soil does not an "entry" make. A completed entry does not occur whenever the border patrol declines to play red rover with an alien in the middle of the Rio Grande. The individual must evade inspection *and* be free of official restraint.

What, then, is freedom from official restraint? It's the alien's liberty to go where he wishes and to mix with the general population. On the flip side, there are at least two ways in which the government might restrain an individual. It could stop the individual physically at the border—the most obvious form of restraint. *See Yang v. Maugans*, 68 F.3d 1540, 1550 (3d Cir.

1995). Or it could monitor the individual as he crosses the border by conducting surveillance of him. *See In re Pierre*, 14 I. & N. Dec. at 469. The government may have good reasons for allowing an alien to cross the border, only to arrest him later in time and miles from the border. The government, for example, might wish to see if the alien leads them to a safe house or joins up with other individuals who have crossed the border illegally.

That law enforcement finds someone close in time to their entry and near the border thus does not by itself establish official restraint. Hence: An alien may complete entry if he drives out of sight for four-tenths of a mile after crossing the border. *Cheng v. INS*, 534 F.2d 1018, 1019 (2d Cir. 1976) (per curiam). An alien may complete entry if he drives out of sight of immigration officials while traveling in the country on a highway for two miles. *Nyirenda v. INS*, 279 F.3d 620, 625 (8th Cir. 2002). Or an alien may complete entry if he crawls fifty yards into the country undetected before being apprehended while climbing a wall. *United States v. Martin-Plascencia*, 532 F.2d 1316, 1317–18 (9th Cir. 1976).

To their credit, the immigration authorities appear to treat the concept of freedom from official restraint the same way across different statutes. They might prefer one meaning of official restraint in cases that arise under a provision in which "a finding that the alien entered free from official restraint rendered the alien deportable." *De Leon*, 761 F.3d at 344; *see, e.g.*, *Cheng*, 534 F.2d at 1019. And they might prefer another reading of freedom from official restraint in other settings. For example, it is a crime for someone whom the government previously deported to re-enter the country. 8 U.S.C. § 1326(a). But to "enter" the country under this criminal statute, as under entry for special rule cancellation purposes, the individual must be free from official restraint. *See, e.g.*, *United States v. Ramos-Godinez*, 273 F.3d 820, 824–25 (9th Cir. 2001); *United States v. Gonzalez-Torres*, 309 F.3d 594, 598–99 (9th Cir. 2002). And there too surveillance counts as official restraint. *See id.* Thus, if the government "maintain[s] continuous observation" of a group of illegal immigrants from the time they cross the border until their apprehension, the aliens have not "entered" the country in violation of the law. *Id.* at 599. But if, absent some other form of restraint, an alien crosses the border and evades detection, "even for a brief period," he has entered the United States. *Ramos-Godinez*, 273 F.3d at 824. And if border patrol agents "did not see" the alien "cross the border," and if

neither side presents "evidence of the precise place where" the alien "had crossed," then that suffices for the government to carry its burden to show that an alien arrested 100 yards from the border "was free to migrate into the general population for some time, and was not under constant observation during that period." *United States v. Catellanos-Garcia*, 270 F.3d 773, 775–76 (9th Cir. 2001). The government thus applies the same definition of entry across statutes. As well it should: In the absence of "a reasoned explanation for the change" in interpretation or a relevant distinction between the statutory provisions, the government has no warrant to use *Chevron* deference to take opposing positions about the same concept just because it helps them in some cases to do one thing and helps them in other cases to do something else. *Encinco Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

In applying this official-restraint test here, the parties agree that surveillance was the only form of official restraint that the government could have used against Lopez before his arrest. Because only the government customarily possesses evidence of surveillance and because an alien cannot prove what he cannot see, we treat surveillance as an affirmative defense, one that allows the government to show official restraint with respect to an individual who crosses the border without being stopped. In this instance, the Board made no factual finding as to whether Lopez was, or was not, under surveillance from the time he crossed the border until the time the border agents found him. The Board sidestepped the question. It instead found that Lopez's capture a mile from the border and thirty-one minutes after his crossing did not suffice to prove that Lopez had evaded apprehension and was free from official restraint. That conclusion does not follow from the facts. No evidence shows that border agents surveilled Lopez when he crossed the border. And Lopez testified that he was looking for a hotel to check into, all consistent with the border patrol's report that said Lopez was in "travel/seeking" when apprehended. A.R. 247. Unless and until the Board finds that Lopez was under surveillance when he crossed the border, that means Lopez was free from official restraint and had evaded inspection.

We accordingly vacate this part of the Board's decision and remand the case to the Board to resolve this factual question or to resolve Lopez's eligibility for special rule cancellation on some other ground.

"*Exceptional and extremely unusual hardship.*" Lopez faces a significant obstacle in challenging the Board's ruling that he had "not establish[ed] that his removal would cause exceptional and extremely unusual hardship to his United States citizen daughter," a requirement for cancellation of removal. A.R. 8; *see* 8 U.S.C. § 1229b(b)(1). As noted, we "lack[] jurisdiction over claims that can be evaluated only by engaging in head-to-head comparisons between the facts of the petitioner's case and those of precedential decisions," or over arguments that "require[] a tallying of hardships" or "second-guessing the agency's weighing of factors." *Ettienne v. Holder,* 659 F.3d 513, 518 (6th Cir. 2011).

That is just what Lopez asks us to do in this case. The Board considered how a move to Guatemala would affect Lopez's daughter. It weighed the changes in the daughter's educational, medical, social, and economic circumstances and applied the Board's precedents to the facts at hand. After all that, it held that Lopez had "not show[n] that his qualifying relative would suffer hardships substantially beyond the ordinary hardships that children and other family members experience when an alien is removed from the United States." A.R. 9. We do not have jurisdiction to second guess whether the daughter's reduced access to quality doctors and schools amounts to an exceptional and extremely unusual hardship. The Board's weighing of the "social and economic conditions in the country of removal" is beyond our jurisdiction, *id.* at 9, despite the "ample evidence of the violence" in Guatemala that Lopez entered into the record, Appellant's Br. 14. And Lopez does not cite a single precedent indicating that the Board misconstrued its own standards, ending our inquiry into the Board's denial of his application for cancellation of removal. *See Ettienne,* 659 F.3d at 518.

### III.

For these reasons, we grant the petition for review in part, reverse its special rule cancellation eligibility ruling, deny the petition in part, and remand to the Board for further consideration of Lopez's eligibility for special rule cancellation.